71 So.3d 611 (2011)
Schenille MARTIN, On Behalf of the Wrongful Death HEIRS OF Floyd L. MARTIN, Deceased, Appellant
v.
B & B CONCRETE COMPANY, INC., Appellee.
No. 2010-CA-00145-COA.
Court of Appeals of Mississippi.
April 12, 2011.
Rehearing Denied June 28, 2011.
Certiorari Denied October 6, 2011.
*612 Joseph E. Roberts Jr., Jackson, Grady F. Tollison Jr., Robert Dallas Schultze, Oxford, attorneys for appellant.
*613 Wilton V. Byars III, Oxford, Joseph Luke Benedict, attorneys for appellee.
EN BANC.
MYERS, J., for the Court:
¶ 1. Floyd Martin (Floyd) was killed in a two-vehicle automobile accident in Lafayette County, Mississippi. His widow, Schenille (Martin), brought a wrongful death suit against B & B Concrete Company, Inc., the owner of the other vehicle and the employer of its driver. The jury returned a verdict for the defendant, and Martin appeals.

FACTS
¶ 2. On June 10, 2005, Floyd was driving his 1966 Ford pickup truck north on CR 405 in Lafayette County, just east of Oxford. Immediately before the accident, Anthony Logan was driving east on Highway 6 in the right lane. Logan was operating a loaded concrete truck owned by B & B Concrete. At its intersection with CR 405, Highway 6 is a four-lane, divided highway with a posted speed limit of sixty-five miles per hour. A grass median separates the east-and west-bound lanes of travel. CR 405 is a county road with a posted speed limit of thirty-five miles per hour. Northbound traffic on CR 405 is required to stop at the intersection before crossing and to yield the right of way to vehicles traveling on Highway 6.
¶ 3. There were several eyewitnesses to the accident, and they gave conflicting testimony about how it occurred. B & B Concrete's witnesses testified that Floyd ran the stop sign before being struck in the right eastbound lane of Highway 6. Witnesses favored by Martin testified that the concrete truck hit Floyd's vehicle while it was stopped at the stop sign. Martin also advanced alternative theories that Floyd was stalled in the intersection or was proceeding slowly through it and had been negligently struck, either because the driver of the concrete truck failed to act to avoid the collision or had not been keeping a proper lookout.
¶ 4. The case was tried to a jury, which returned a verdict for B & B Concrete. Martin appeals from that judgment. She presents several issues for our review.

DISCUSSION

1. Jury Instructions
¶ 5. Martin contends that the trial court erred in giving or refusing several jury instructions. Our standard of review for jury instructions is as follows:
The instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case.
Nunnally v. R.J. Reynolds Tobacco Co., 869 So.2d 373, 378 (¶7) (Miss.2004).

A. Instructions P-10 & P-12
¶ 6. In her brief, Martin challenges the trial court's refusal of two instructions, P-10 and P-12. These instructions, although apparently proffered to the trial court, are not found in the record before this Court on appeal. Consequently, these issues are not properly before this court. With jury instructions, "[w]e cannot review the bare assertions in the parties' briefs, but must look to the record." Rogers v. State, 796 So.2d 1022, 1029 (¶ 24) (Miss.2001).

*614 B. Peremptory Instructions P-2, P-6, & P-11

¶ 7. Martin also challenges the trial court's refusal of instructions P-2, P-6, and P-11, which are peremptory instructions. In reviewing an appellant's contention that the trial court should have granted a peremptory instruction, we apply the same standard of review as the denial of a motion for a directed verdict or a judgment notwithstanding the verdict:
This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.
Ala. Great S. R.R. Co. v. Lee, 826 So.2d 1232, 1235-36 (¶ 12) (Miss.2002). Our review of a trial court's refusal of peremptory instructions is de novo. Windmon v. Marshall, 926 So.2d 867, 872 (¶ 20) (Miss. 2006).
¶ 8. P-11 would have instructed the jury that Logan, the driver of the concrete truck, had been negligent for failing to decrease his speed as he approached the intersection with CR 405. In his testimony, Logan stated that he had been driving between forty and fifty-five miles per hour before approaching the intersection but did not reduce that speed further as he neared the intersection. Martin argues that this was negligent per se, an admitted and uncontested violation of Mississippi Code Annotated section 63-3-505 (Rev. 2004), which requires that "[t]he driver or operator of any motor vehicle must decrease speed when approaching and crossing an intersection."
¶ 9. As the relevant facts are essentially uncontested, this issue presents a question of law. In Richardson v. Adams, 223 So.2d 536, 538 (Miss.1969), the supreme court held that subsection 8176(b) of the Mississippi Code of 1942 (Supp.1968), the prior incarnation of section 63-3-505, only "qualified" the maximum permitted speed of travel under certain circumstances. Thus, the court held that a driver would not be negligent as a matter of law in failing to reduce her speed approaching an intersection, so long as she traveled below the posted speed limit. Id. The question of whether, under all the circumstances, the driver should have reduced her speed further as she approached the intersection was a question of fact for the jury. Id. The jury instructions given by the trial court in this case are consistent with the supreme court's holding in Richardson.
¶ 10. Martin acknowledges Richardson, but she contends that it has been superseded by the recodification of the statute in the Mississippi Code of 1972. When the Richardson court examined section 8176 of the 1942 code, it contained three subsections relevant to our analysis. Subsection 8176(b), now codified as section 63-3-505 of the 1972 code, required among other things that a driver reduce his speed when approaching and crossing an intersection. Subsection 8176(a) established maximum speeds for various classes of vehicles on state highways. Subsection 8176(c) allowed lower speed limits to be posted where necessary. The Richardson court reasoned that subsection (b) must be read in context with the rest of section 8176:

*615 [W]hen section 8176 is viewed in its entirety, the true meaning of subsection (b) becomes apparent. The first part of the statute sets the maximum speed limits permissible on the state highways. Subsection (b) qualified the allowed maximums when any of the conditions enumerated therein arise. In order to be in violation of the statute one must fail to reduce his speed from the maximum provided when one of the conditions set out in subsection (b) is present.
Richardson, 223 So.2d at 538.
¶ 11. When section 8176 was recodified, subsection (b) became section 63-3-505 in the 1972 code. Subsections 8176(a) and 8176(c) were incorporated into sections 63-3-501 (Rev.2004) and 63-3-503 (Rev.2004), respectively. Martin contends that in the present code, section 63-3-505 now "stands alone" and should no longer be interpreted as qualifying the speed limits established elsewhere. She argues that section 63-3-505 now requires that a driver approaching and crossing an intersection reduce his speed regardless of his prior speed.
¶ 12. We find that this contention is without merit. The subsections of the 1942 code relied on by the Richardson court remain in the 1972 code. They may have been reorganized as separate sections, but they remain in a common title, chapter, and article of the code. Martin offers no compelling reason for this Court to reject the supreme court's holding in Richardson and interpret section 63-3-505 in isolation. Moreover, the interpretation Martin advancesthat speed must be reduced regardless of prior speedwould lead to irrational results and may be unworkable in practice. Under her reading, Logan would have been negligent as a matter of law for proceeding through the intersection while traveling between ten and twenty-five miles per hour below the posted speed limit, but if he had slowed only slightly from the maximum posted speed, he would not have been negligent. Another consequence of her proposed interpretation would be that a driver approaching a series of intersections would be required to reduce his speed for each individually, but if he were to reduce his speed once and maintain that lower speed, he would be driving negligently as a matter of law, no matter how much he had reduced his speed. That is not a rational result.
¶ 13. Logan testified that he was driving at a speed between ten and twenty-five miles below the posted speed limit, in part because he was aware of the danger posed by traffic entering and crossing the highway. We cannot say that this was negligent as a matter of law or that the trial court erred in refusing a peremptory instruction.
¶ 14. Martin also challenges the trial court's refusal of P-2 and P-6, which are also peremptory instructions. P-2 would have instructed the jury to "return a verdict for Martin," while P-6 would have instructed the jury that Logan's operation of the concrete truck was negligent as a matter of law and that the jury was only asked to determine whether his negligence was a proximate cause of the accident. Her arguments regarding these instructions are the same as those offered regarding P-11, and we likewise find them without merit.

C. Instructions D-16(a) & D-17
¶ 15. Finally, Martin challenges the trial court's granting of instructions D-16(a) and D-17. D-16(a) instructed the jury that Floyd would have been negligent if he had stopped his vehicle within the intersection. Martin contends that the instruction was misleading because it did not also instruct the jury that Logan also had a duty to take reasonable precaution to *616 avoid the collision, even if Floyd had negligently stopped in the intersection. Martin also contends that D-17, which instructed the jury on Floyd's duties to stop at the intersection and yield the right of way, failed to advise the jury of Logan's duty to avoid a collision even if Floyd had failed to yield before entering the intersection.
¶ 16. We find these arguments without merit, as Logan's duty to avoid a collision notwithstanding Martin's negligence was outlined in other instructions given by the trial court. P-7 stated that Logan had a duty "to exercise ordinary and reasonable care . . . to . . . to keep [his] vehicle under proper control under the circumstances." P-8 stated that Logan had to "exercise ordinary and reasonable care. . . to . . . maintain a reasonable and proper lookout for other vehicles." P-13 stated that Logan "had a duty to use reasonable precaution to attempt to avoid the vehicle operated by [Floyd]," even if Floyd had negligently entered the intersection. Considering all of the instructions given by the trial court, we find that the jury was properly instructed on Logan's duty, and accordingly, we can find no error in the trial court's giving of these two defense instructions.

2. Weight of the Evidence
¶ 17. Martin contends that the jury's verdict in favor of B & B Concrete is against the overwhelming weight of the evidence. In reviewing the weight of the evidence supporting a jury's verdict, this Court must accept as true the evidence which supports the verdict. Tentoni v. Slayden, 968 So.2d 431, 440-41 (¶ 27) (Miss.2007). We will only reverse "when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Id. "[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005).
¶ 18. This issue is largely a rehashing of Martin's prior arguments for peremptory instructions, which we have already found without merit. Martin also adds the contentions that the evidence was overwhelming that Logan negligently failed to see Martin's vehicle in time to avoid the collision, and even accepting Logan's testimony as true, once he had seen Martin's vehicle, Logan negligently failed to take steps to avoid the collision.
¶ 19. It is uncontroverted that Logan had a duty to keep a reasonable and proper lookout for other vehicles and to keep his vehicle under reasonable and proper control. See, e.g., Busick v. St. John, 856 So.2d 304, 317 (¶ 39) (Miss.2003). The supreme court has also held that "the motorist's right to assume that the driver of a vehicle proceeding toward an intersection will obey the law of the road, which requires him to stop before entering the intersection, exists only until he knows or in the exercise of ordinary care should know otherwise." Id. (quoting Jobron v. Whatley, 250 Miss. 792, 168 So.2d 279, 284 (1964)).
¶ 20. Martin makes two contentions regarding the weight of the evidence. First, she argues that the evidence was overwhelming that Logan negligently failed to keep a proper lookout when approaching the intersection. If he had, she argues, Logan would have seen that Floyd's vehicle was not going to stop at the intersection in time for Logan to avoid the accident. Logan testified that his view of CR 405 was obscured by trees lining Highway 6. In arguing that the verdict is against the weight of the evidence, Martin points to competing evidence that suggested Logan's view of CR 405 as it approached *617 Highway 6 would have been unobstructed. We think this presented a question of credibility, which is for the jury alone. In reviewing the weight of the evidence supporting a verdict, this Court will not "pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." Massey v. State, 992 So.2d 1161, 1163 (¶ 12) (Miss.2008). Additionally, Martin fails to demonstrate that the evidence was overwhelming that Logan could have avoided the collision by reasonable means, even if he had been able to see down CR 405 as he approached the intersection. The jury could have accepted Logan's testimony that he had no time to react after Floyd ran the stop sign, as the evidence showed Floyd had only traveled about twenty-five feet beyond the stop sign when the collision occurred.[1]
¶ 21. Martin also contends that Logan was negligent because, according to his own testimony, Logan did not sound his horn or apply his brakes even after he realized Floyd's vehicle would not stop for the intersection. Again, Logan testified that he did not brake or sound his horn because of the short time he had to react. Logan stated that he instead attempted to change lanes to avoid the collision but could not do so quickly enough. Martin argues that this was tantamount to Logan admitting he failed to take reasonable steps to avoid the collision, but we conclude that this again presented a jury question as to whether Logan's actions were reasonable under all the circumstances. As to the specific contention that Logan was negligent for failing to apply his brakes prior to the collision, B & B Concrete's accident reconstructionist testified that he had concluded the skid marks indicated that Logan had actually applied the brakes before colliding with Floyd's vehicle. The expert testified that the concrete truck's brakes had not fully activated because of "air lag"a delay of about one-half second between depressing the pedal and the brakes being applied at full force. The jury could have concluded that Logan did attempt to brake prior to the collision but did not remember because of the suddenness of the collision or the excitement of the moment.
¶ 22. We think the questions of whether Logan kept a reasonable lookout and exercised reasonable care to avoid the collisionand whether any failure to do so was a proximate cause of the accidentwere properly left to the jury. We cannot say that the verdict is against the overwhelming weight of the evidence. This issue lacks merit.

3. Supplementation of Expert Testimony
¶ 23. Martin contends in her final issue that the trial court erred in allowing B & B Concrete to supplement the designation of its accident reconstruction expert, Dr. Thomas Talbot. The supplementation was made approximately three and one-half weeks before the trial date. Martin relies on Uniform Rule of Circuit and County Court 4.04(A), which states in pertinent part: "Absent special circumstances the court will not allow testimony at trial of an expert witness who was not designated as an expert witness to all attorneys of record at least sixty days before trial."
¶ 24. "The control of discovery is a matter committed to the sound discretion of the trial judge." Holland v. Mayfield, 826 So.2d 664, 673 (¶ 37) (Miss.1999). *618 Likewise, the standard of review for the admission or exclusion of testimony is abuse of discretion. Causey v. Sanders, 998 So.2d 393, 399 (¶ 14) (Miss.2008). The admission of expert testimony is left to the sound discretion of the trial judge. Id. Unless the trial judge's decision is arbitrary and clearly erroneous, it will stand. Windmon v. Marshall, 926 So.2d 867, 876 (¶ 38) (Miss.2006).
¶ 25. For reversible error to be found in the admission or exclusion of evidence, the error must also result in prejudice and harm or adversely affect a substantial right of a party. Id.
¶ 26. B & B Concrete responds that the supplementation was required to address Martin's own late designation of her expert and a change in Martin's theory of the case. In her complaint, Martin alleged that her husband had been killed after his vehicle was struck while stopped at the stop sign on CR 405. Martin offered her own accident reconstructionist, Dr. Tim Corbitt. Her initial designation of Dr. Corbitt stated only that his opinion was that Martin's vehicle was "either stopped [or] moving very slowly at the time of the collision." After being ordered to do so by the trial court, Martin supplemented this designation. Corbitt's supplemental designation stated that his opinion was that the collision had occurred while Floyd was stopped or moving slowly inside the intersection, rather than at the stop sign. This was apparently the first time Martin had advanced this "alternate theory" of how the accident had occurred. Martin's supplemental designation was made about seventy-five days before the trial was scheduled to be held. B & B Concrete offered a supplemental designation of its own expert, Dr. Talbot, about twenty-five days before the trial date. Dr. Talbot opined that Floyd's vehicle was traveling at a significant speed at the time of the impact. The trial court denied Martin's motion to prevent Dr. Talbot from testifying about his supplemental opinion.
¶ 27. While it is true that B & B Concrete's supplemental designation was filed outside the sixty-day deadline, Rule 4.04(A) allows designations to be made closer to trial under "special circumstances." The supreme court has stated that it "has laid down no hard and fast rule as to what amounts to seasonable supplementation. . . . Seasonableness must be determined on a case by case basis looking at the totality of the circumstances surrounding the supplemental information the offering party seeks to admit." Hartel v. Pruett, 998 So.2d 979, 985 (¶ 14) (Miss. 2008) (internal quotations omitted). Under these circumstances, we can find no abuse of discretion in the trial court's allowing Dr. Talbot to testify.
¶ 28. Finally, Martin contends that the trial court erred in permitting Dr. Talbot to testify at trial to a more specific estimate of Floyd's vehicle's speed than B & B Concrete had disclosed in its designation. The designation stated that Dr. Talbot would testify that Floyd was traveling at "significant speed" or, alternatively, "at least [fifteen] miles per hour." The trial court allowed Dr. Talbot to opine in his testimony at trial that Martin was traveling at approximately thirty miles per hour at the time of the collision. Martin fails to demonstrate that this was an abuse of discretion, as she offers no relevant authority to support her assertions. Consequently, the issue is barred on appeal. Ruff v. Estate of Ruff, 989 So.2d 366, 372 (¶ 24) (Miss.2008).
¶ 29. THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*619 GRIFFIS, P.J., ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, P.J. BARNES AND MAXWELL, JJ., NOT PARTICIPATING.
LEE, C.J., Concurring in Part and Dissenting in Part:
¶ 30. With respect for the majority, I must dissent for two reasons. First, I find we should allow Schenille Martin to amend the record with missing jury instructions P-10 and P-12 or explain why they are missing. Second, I would find that Dr. Thomas Talbot's testimony as to the speed of Floyd Martin's vehicle was not admissible. I agree with the majority's analysis on the remaining issues.

Jury Instructions
¶ 31. According to Martin's brief, jury instruction P-10 instructed the jury that the driver for B & B Concrete, Inc. should have yielded the right-of-way to Floyd after Floyd had yielded to traffic that constituted an immediate hazard on Highway 278. This instruction would have tracked the language of Mississippi Code Annotated section 63-3-805 (Rev.2004). The theory of Martin's case was that Floyd was either stopped or barely moving at the time of the collision, and he was only two or three feet at the most into the intersection when his vehicle was hit. Martin argues that instructions P-8, P-13, and D-19 are similar to P-10, but they do not address the driver's duty to maintain a proper look out.
¶ 32. As to jury instruction P-12, Martin argues that this instruction would have addressed whether the driver for B & B was negligent in failing to take reasonable precautions to avoid the collision. Specifically, if the driver for B & B realized that Floyd was not going to stop at the stop sign, he should have taken precautionary action to avoid the accident. The proposed instruction would have tracked the language of section 63-3-805. Martin argues that this instruction was not covered by any other instruction.
¶ 33. I find that Martin raises valid arguments regarding the exclusion of these instructions. The majority has declined to review these instructions because they were not included in the record. I find this is punitive. Both Martin and B & B have made arguments in their briefs regarding these instructions. No objection was made to the absence of the instructions from the record. Justice would be better served if this Court would seek to supplement the record with jury instructions P-10 and P-12.

Expert Testimony
¶ 34. Martin argues that B & B's expert, Dr. Talbot, should not have been allowed to testify at all regarding Martin's speed. In the alternative, Martin argues that Dr. Talbot should not have been allowed to testify beyond the opinions presented in his supplemental designation.
¶ 35. Dr. Talbot was designated as B & B's expert on February 13, 2009. Dr. Talbot's report opined that Floyd's vehicle was in the right lane of Highway 278 when the collision occurred. Martin's expert, Tim Corbitt, was designated on February 17, 2009. Corbitt opined that Floyd's vehicle was either stopped or "moving very slowly" when the collision occurred. On September 2, 2009, Dr. Talbot supplemented his report and stated that Floyd's vehicle was traveling "at least 15 M.P.H." This was twenty-seven days before trial. However, at trial, Dr. Talbot testified that Floyd's vehicle was traveling "twenty-five to thirty miles an hour." Martin's counsel objected to the testimony, and the objection was overruled.
*620 ¶ 36. Mississippi Rule of Civil Procedure 26(f)(1) requires litigants to supplement interrogatory responses in regard to "the substance of the testimony." The rule also imposes a duty on the parties to amend a prior response when "the party knows that the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." M.R.C.P. 26(f)(2)(B). The failure to supplement or amend a response seasonably is a discovery violation that may warrant sanctions, including exclusion of evidence. Ekornes-Duncan v. Rankin Med. Ctr., 808 So.2d 955, 958 (¶ 10) (Miss.2002). Rulings on discovery violations will not be overturned absent an abuse of discretion. Id. (citing Gray v. State, 799 So.2d 53, 60 (¶ 26) (Miss.2001)).
¶ 37. I do not take issue with the timing of Dr. Talbot's supplemental report. Whether a supplementation is "seasonable" is determined by the trial court on a case-by-case basis. Buchanan v. Ameristar Casino Vicksburg, Inc., 957 So.2d 969, 973 (¶ 9) (Miss.2007). Dr. Talbot's trial testimony was technically within the parameters of his supplemental report, which opined that Floyd's speed was "at least" fifteen miles per hour. However, I find that doubling the opined speed during trial amounted to a "trial by ambush," which our discovery rules are designed to prevent. Harris v. Gen. Host Corp., 503 So.2d 795, 796 (Miss.1986). Martin's counsel was unprepared to respond to expert testimony that Floyd was traveling at speeds up to thirty miles per hour.
¶ 38. I strongly believe in the jury system, but I also believe in the opportunity to receive a fair trial. I would find that the trial court abused its discretion when it declined to strike portions of Dr. Talbot's testimony. Thus, I would reverse and remand for a new trial.
IRVING, P.J., JOINS THIS OPINION.
NOTES
[1] The collision occurred in the outside lane of Highway 6 nearest to CR 405. The stop sign on CR 405 was set back approximately twenty-five feet from the travel lanes of Highway 6.